IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 7, 2019 at Jackson

## RODNEY RAYMOND BREWER, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County**
**No. 18378PC      Forest A. Durard, Jr., Judge**

_____

### No. M2018-01493-CCA-R3-PC
_____

The Petitioner, Rodney Raymond Brewer, Jr., appeals from the denial of his petition for post-conviction relief. The Petitioner pled guilty to Class B felony possession of a schedule II controlled substance with the intent to sell in exchange for an agreed-upon Range I sentence of eleven years. On appeal, the Petitioner alleges that he received ineffective assistance due to trial counsel's (1) failure to effectively investigate and argue the motion to suppress; (2) failure to investigate the Petitioner's range classification; (3) failure to properly advise him regarding the law of constructive possession; (4) failure to argue for enforcement of the original nine-year plea offer; and (5) failure to file an appeal. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Robert T. Carter, Tullahoma, Tennessee, for the appellant, Rodney Raymond Brewer, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

After a January 13, 2016 search that led to the discovery of drugs and drug paraphernalia, the Bedford County Grand Jury returned a four-count indictment against the Petitioner, charging him with alternative counts of possession of a schedule II

controlled substance, to wit: 2.42 grams of cocaine, with the intent to sell or deliver, both Class B felonies, and with one count each of simple possession of a schedule VI controlled substance, to wit: marijuana, and unlawful possession of drug paraphernalia, both Class A misdemeanors. Prior to trial, the State had filed a notice to seek enhanced punishment which, facially, placed the Petitioner as a Range II, multiple offender.[1] Also prior to trial, trial counsel filed a motion to suppress the search that led to discovery of the drugs and drug paraphernalia, but the motion was denied after a hearing because the trial court determined that the Petitioner lacked standing to challenge the search.

On March 13, 2017, after trial had begun and voir dire had been completed, the Petitioner entered a guilty plea to one count of Class B felony possession of a schedule II controlled substance with the intent to sell, see Tennessee Code Annotated section 39-17-417, with an agreed-upon Range I sentence of eleven years. At the guilty plea submission hearing, the prosecutor's opening statement was incorporated into the record by reference as providing a factual basis in support of the Petitioner's plea.

The prosecutor stated that on the evening of January 13, 2016, agents of the Drug Task Force "were investigating illegal drug activity" at a house on East Depot Street in Shelbyville. The agents had "set up surveillance on the house," and "[t]hey observed some activity which indicated that drug activity was afoot." According to the prosecutor, the agents "decided to go up to the back door as they had been observing people doing, [and] knock on the back door."[2] Paula Freeman opened the back door, and the agents "went inside." Once in the kitchen, the agents "had a very brief conversation with Ms. Freeman, and one of the agents decided to step into the adjoining room, which was the living room, wherein he discovered the [Petitioner]."[3] The prosecutor continued, "[T]he [Petitioner] had just stood up from a chair that was in there, and beside the chair was an end table."[4] According to the prosecutor, the agents "noticed various evidence, drugs and

---

[1] It appears that this notice of enhancement was filed on February 27, 2017, although the notice is not a part of the record on appeal.

[2] At the suppression hearing, Agent Jose Ramirez with the 17th Judicial District Drug Task Force testified that he approached the residence to execute an arrest warrant for Paula Freeman for conduct that occurred in October 2015. The agents were also "looking for a gentleman but specifically" did not know the gentleman's identity.

[3] Agent Ramirez testified at the suppression hearing that once he and Agent Shane Daugherty were inside the kitchen of the home speaking with Ms. Freeman, they decided to conduct a "walk thru" of the residence for "officer safety" because they "heard movements or sounds coming from different parts of the house."

[4] Agent Daugherty further stated at the suppression hearing that he was the first to encounter the Petitioner who "was standing in the middle of the living room when [he] came around the corner." Agent Ramirez testified that Agent Daugherty informed him that he saw the Petitioner "sitting in the chair in the

drug paraphernalia, sitting on that end table beside where the [Petitioner] had been seated." When the agents examined the table more closely, they found a small amount of marijuana, "some smoked marijuana blunts," and some drug paraphernalia, including digital scales, "a bong," and rolling papers. The Petitioner's cell phone was also discovered amongst the items on the table.

After being given Miranda warnings, the Petitioner admitted that "virtually every item on the table belonged to him except for the crack cocaine."[5] However, the Petitioner told the agents that "he had sources of supply for crack cocaine" in both Murfreesboro and Nashville and that "he would be willing to work with the drug task force in catching these individuals." The prosecutor also described that the crack cocaine was in a "bunch of little plastic bags" inside of a larger plastic bag, indicating that it was packaged for resale, and that the total amount was "fairly large . . . with a pretty hefty street value of probably anywhere from about $250 to $500 worth." In addition, the Petitioner was found to have $136 cash on his person.[6]

At the guilty plea submission hearing, the Petitioner acknowledged that the statements made by the prosecutor during his opening statement were "accurate statements" of the facts in support of his plea. The trial court then explained the elements of the offense to which the Petitioner was pleading guilty:

> That you knowingly possessed, whether it was actual possession or constructive possession and whether that possession was sol[e] or whether that possession was joint, that is with one or more other persons, a substance containing cocaine base. And that that substance is classified as a schedule II controlled substance and that at some point those drugs were possessed with the intent to later sell them.

The trial court reiterated that "possession [could] be either actual or constructive" and provided examples:

> [A]ctual possession is, it's in your pocket. Constructive possession, . . . you get pulled over for speeding, they want to see your registration and your insurance, you don't have those in your pocket but they're in the glove

living room."

[5] The prosecutor did not provide specific details during his opening statement as to where or how the crack cocaine was found on the table.

[6] Because it is relevant to the Petitioner's post-conviction issues, we note that according to Agent Daugherty at the suppression hearing, the agents later found the Petitioner's duffle bag or "overnight bag" in the living room "after receiving consent to search the residence by the homeowner or the person on the lease." However, no contraband was found inside the bag.

box.  Not on your person but all you've got to do is reach over there, open the glove box and pull those out and give them to the officer[.]

The Petitioner affirmed that he understood the concept and the charges against him.

Additionally, the Petitioner indicated that he understood the respective ranges of punishment for those crimes.  When asked if he had any questions about what the possible punishments were, the Petitioner replied, "I didn't understand the enhancement factor to[o] much as far as . . . .  Like, I was told that my previous felonies could have an enhancement factor."  When the Petitioner was asked specifically about his two prior qualifying felonies, the following exchange took place:

Q. I understand that you have two prior felonies; is that right?
A. Yeah.  One from like twenty years ago and one from like --
Q. That still counts.
A. -- fifteen.
Q. And what [were] they?
A. One was --
[TRIAL COUNSEL]: Burglary, I believe.
THE [PETITIONER]: Parts of the crime were burglary.
THE COURT: All right. Which would have been a D-felony in Tennessee; is that correct, General?
[ASSISTANT DISTRICT ATTORNEY GENERAL]: Yes.
[TRIAL COUNSEL]: The other one was an Attempted Possession of Schedule II.
THE [PETITIONER]: [] Possession of a Schedule II.
[TRIAL COUNSEL]: Which was a C-felony.

The trial court explained range classification to the Petitioner and stated that "it sound[ed] like" the Petitioner's two prior felonies "would have translated into C and D felonies in this state," which would have enhanced him from Range I to Range II status. Moreover, the trial court informed the Petitioner that if he were convicted at trial and found to be a Range II, multiple offender, he would have been exposed to a sentencing range between twelve to twenty years at thirty-five percent.  The trial court also told the Petitioner that if he had "other misdemeanors or other things," then his sentence could be enhanced in the range.  The Petitioner affirmed that he understood, and he had no other questions in that regard.

Moreover, the Petitioner was informed that by pleading guilty, he was waiving his right to a jury trial and to appeal the jury's decision.  The Petitioner was also apprised that if he chose to proceed to a jury trial, he could confront the witnesses against him, and that he was entitled to testify on his own behalf, but that no negative inference could be

-4-

drawn by the jury if he decided not to testify. The trial court further told the Petitioner that he was waiving his "right to appeal any sentencing issues" because this was an agreed-upon eleven-year sentence and thus there was "nothing to appeal from[.]" The Petitioner affirmed that he understood and was executing a knowing waiver of these rights.

The Petitioner then confirmed that no one had threatened him into pleading guilty, that no one had promised anything to induce him to enter a plea other than what had been discussed in court, and that he was pleading guilty of his own free will. In addition, the Petitioner affirmed that he was accepting a Range I sentence because he feared the possibility of a Range II sentence if he proceeded to trial and was convicted.

When asked about trial counsel's performance during the trial process, the Petitioner said that "[a]t some points," he had encountered problems speaking with trial counsel. The Petitioner explained, "You seen [sic] me explode in the courtroom," and the trial court responded that it had indeed witnessed the Petitioner "get mad a few times." The Petitioner expressed his concern that at times, he had questions but had been "shewed off." The trial court inquired if the Petitioner had any questions now or wanted something explained further to him, and the Petitioner replied in the negative.

The Petitioner and the trial court then engaged in further discussion about the concept of standing, the issue at the motion to suppress hearing. The trial court explained to the Petitioner as follows:

> Standing is the ability for one, to contest a search, you have to have that. For instance, if you're riding in my car and I get pulled over and there is a bunch of drugs in there, you don't have any right to complain about what's in my car because you have no expectation of privacy in my car. In other words, it's my car, it's private to me, but it's not private to you. And so the first thing that we'd have to establish when suppressing contraband or whatever it may be is whether the person has a right to complain about it to begin with.

The Petitioner stated that the trial court's explanation "clear[ed] that up for [him]," and he did not have any further questions. The trial court then accepted the Petitioner's plea.

The Petitioner's pro se petition for post-conviction relief was filed on October 23, 2017. Counsel was appointed, but no amended petition was filed. At the outset of the post-conviction hearing, post-conviction counsel set forth the issues as follows: (1) trial counsel failed to effectively investigate and argue the motion to suppress heard on February 23, 2017; (2) trial counsel failed to investigate whether the Petitioner "was actually a Range II offender" and "that he was in all likelihood a Range I offender"; (3)

-5-

trial counsel failed to advise the Petitioner "on the law regarding constructive versus actual possession of schedule drugs"; (4) trial counsel failed to argue for enforcement of the original nine-year plea offer; and (5) trial counsel failed to file an appeal after the Petitioner entered his plea, specifically a motion to set aside the plea or for a reduction in sentence. The Petitioner and trial counsel testified at the post-conviction hearing.

At the post-conviction hearing, the Petitioner indicated that he had filed a pro se motion to suppress before trial, which the trial court rejected because he was represented by counsel, and that trial counsel then filed a suppression motion on his behalf.[7] The Petitioner said that he had filed his own suppression motion initially because it was getting close to the trial date and trial counsel had yet to file one, so the Petitioner was worried that the deadline to file would pass. The Petitioner complained that the motion filed by trial counsel did not seek to suppress the Petitioner's arrest. The Petitioner also took issue with how trial counsel argued the suppression issue: "I think he should have argued far as the way they arrested me, far as how I was charged with the drugs to be arrested in the first place." Moreover, the Petitioner testified that although he claimed the marijuana on the table, the agents "went in something, pulled some [crack cocaine] out, set it on the table, and said that's your crack." The Petitioner acknowledged that no drugs were found on his person or in his duffle bag and indicated that they were "found way across the room." According to the Petitioner, trial counsel did not explain the concept of standing to him prior to the hearing.

The Petitioner also stated that the agents claimed that they were in the house because they had an arrest warrant for Paula Freeman, "but they really was [sic] in there because of [him]." The Petitioner averred that the agents never produced an arrest warrant for Paula Freeman while they were in the house that night. According to the Petitioner, in the suppression motion filed by trial counsel, trial counsel asserted that the arrest warrant for Paula Freeman had never been filed with the Sheriff's Department or the Clerk of the Court. However, according to the Petitioner, trial counsel brought him the arrest warrant "a couple of days before trial." The Petitioner complained,

> So then I told him, I said, you need to look into that because it seems like now they [were] planting evidence to help them. He said, uh, naw, they wouldn't. . . . [Trial counsel's] going to fry me up. He['s] working with the State. He was never for my defense or my liberty. So, might as well plead it out. And if I go to trial, I was like he['s] probably going to sandbag the trial.

The Petitioner asserted that factored into his decision to accept the plea.

---

[7] Although a transcript of the motion to suppress hearing was made an exhibit to the post-conviction hearing, neither of the written motions to suppress were included in the record.

Furthermore, the Petitioner indicated that during the suppression hearing, the agents testified that the only things they saw on the table were the marijuana, scales, rolling papers, and a cell phone. The Petitioner maintained that trial counsel should have objected when the prosecutor told the judge that the crack cocaine was found under the marijuana because it was not in plain view. The Petitioner continued, "The man went in something and pulled it out of something and set it on the table. That's the only way it came in plain view." The Petitioner also explained that he wanted trial counsel to exploit the inconsistencies in the testimony from Agent Jose Ramirez and Agent Shane Daugherty regarding the events that led to the Petitioner's arrest.

The Petitioner testified that he did not understand range classifications until he "got to the penitentiary." He asserted that based upon his current understanding, he was a Range I, standard offender. Regarding the Petitioner's prior criminal record, the Petitioner testified that he was convicted of attempted possession of a Schedule II controlled substance in Tennessee in 2005, a Class C felony. He also had misdemeanor convictions for prohibited weapons, criminal impersonation, and drug possession. The Petitioner described his October 1999 Wisconsin conviction as being a "party to a crime of burglary," explaining that he had driven his cousin "to his supposed to [have] been girlfriend['s]" house and that the cousin committed a crime once there. The post-conviction court inquired further, attempting to find out additional details of the offense to determine the potential felony classification in Tennessee. Post-conviction counsel informed the post-conviction court that the Petitioner's argument was that "it was an accessory to simple burglary," which would be a Class E felony in Tennessee. The State interjected, "He was convicted of burglary of a building or dwelling," which would be a Class D felony in Tennessee, assuming it was "a non-habitation." In addition, the Petitioner claimed that he asked trial counsel to "pull" the transcript of his Wisconsin guilty plea to clarify the details of the conviction. The abstract of the Wisconsin conviction was exhibited to the post-conviction hearing.[8]

According to the Petitioner, at the time he entered his guilty plea in this case, he did not have a full understanding of the charges against him. The Petitioner complained that trial counsel explained constructive possession by "just saying because [the Petitioner] was in the living room, and they found drugs in the living room, and [he] was the only one in the living room, that's my charge." Stated another way, trial counsel told the Petitioner that "constructive possession was anyone in the vicinity area or that had domain of the area where the drugs was [sic] found." The Petitioner claimed that if he

---

[8] Post-conviction counsel objected to admission of the abstract because it was not "a certified document from the State of Wisconsin." While the post-conviction court stated that it had "some tendency unfortunately to agree with" post-conviction counsel, it would admit the abstract for identification purposes because the Petitioner had "testified to it."

had known there was more to constructive possession than mere proximity, then he would have chosen to go to trial.

The Petitioner testified that the State offered him a plea deal of nine years at thirty percent on October 17, 2016, and that he "signed for the nine-year deal" that day. However, according to the Petitioner, his attorney at that time[9] told him "to go to lunch" before he was able to accept the deal in open court. The Petitioner claimed that as he sat in his vehicle in the court's parking lot, a deputy took him into custody for contempt of court because he left the courtroom area. The Petitioner maintained that sometime after trial counsel was appointed, he asked trial counsel about the deal and told trial counsel that he still wanted to accept it. However, according to the Petitioner, when trial counsel responded to him "weeks later," trial counsel told him that the judge had taken "the deal off the table." Because the Petitioner believed that he had until March 13, 2017, the day of trial, to accept the deal, he wrote a letter to the prosecutor "telling him [he] wanted to take the nine-year deal." According to the Petitioner, when he was in court for trial on March 13, 2017, the prosecutor told him, "I got your letter, uh, I would like to let you take the nine-year deal, but the [j]udge said no, . . . you can't get the nine-year deal. I been texting him all morning trying to convince him for you to take the nine-year deal."

After trial had begun, the State made a new plea offer of eleven years as Range I, standard offender, which the Petitioner accepted. He explained that at that time, he was faced with a Range II sentence of twelve to twenty years, and he believed "[t]he judge [was] fixing to slam [him]" given their negative interactions with each other. Because he also thought he could not "get around" the theory of constructive possession, the Petitioner decided it was better for him to "plead out."

The Petitioner asserted that he was dissatisfied after he entered his plea, so he asked trial counsel to file an appeal. The Petitioner informed trial counsel, "I need a court higher than this to look at all this, this what's going on, or we need to get back in [c]ourt and we need to do this the correct way. I said, it is not sitting with me right." According to the Petitioner, trial counsel agreed to appeal but never followed through with it.

On cross-examination, the Petitioner acknowledged that at the hearing on October 17, 2016, his bond was revoked and that on November 23, 2016, the court conducted a hearing on the Petitioner's motion to have his bond reinstated. However, according to the Petitioner, he "got in to it" with his lawyer from the Public Defender's Office at the November hearing,[10] who then withdrew from representing the Petitioner, and trial

---

[9] Subsequently, after a conflict arose, trial counsel was appointed.

[10] Other statements made during the pendency of the post-conviction hearing indicate that trial counsel

counsel was appointed. The Petitioner indicated that the bond hearing was rescheduled to December 19, 2016. The Petitioner recalled that at this December 19, 2016 hearing, the trial court informed trial counsel to file any motions on the Petitioner's behalf before March 13, 2017, and that the trial court also set the cut-off date for the Petitioner to accept the nine-year plea offer as March 13, 2017.

The Petitioner asserted that trial counsel had not conferred with him enough, so he took it upon himself to contact the prosecutor and express his desire to take the nine-year deal. The Petitioner indicated that he wrote the letter to the prosecutor "about a week, maybe week and a half," before March 13, 2017. According to the Petitioner, on the morning of trial, the prosecutor informed him that the trial court had indicated, through text communications, it would not accept the original deal of nine years but was willing to entertain another offer. The Petitioner claimed that when the prosecutor received the Petitioner's letter on March 10, 2017, the prosecutor "was supposed to have made sure that that deal went through because the deadline or cut-off was March 13th." The Petitioner further believed that the trial court was required to inform him in open court of its reasoning for rejecting the nine-year plea deal. Nonetheless, the Petitioner conceded that he never expressed his intention in court to accept the nine-year plea at any of the hearings that took place on October 17, 2016, November 23, 2016, December 19, 2016, or February 23, 2017.

Regarding the motion to suppress the evidence, the Petitioner acknowledged that only $136 in cash was found on his person and that the drugs were not found on his person or in his duffle bag. He was reminded that the trial court found that he had no standing to challenge a search of the common areas of the living room. However, the Petitioner felt that trial counsel came to the suppression hearing unprepared to "defend" the motion, including being unprepared to assert grounds for standing. The Petitioner claimed that he did not know the motion to suppress hearing was occurring on February 23, 2017, but instead thought he was getting arraigned on a separate conspiracy charge that day. When the Petitioner was asked to support his position that he had standing to challenge the search, the Petitioner responded, "I'm a guest in a house like the [j]udge just said, I ain't got no standing except for my personal effects and my property."

After acknowledging that he "[did] not have standing," the Petitioner engaged in a dialogue about constructive possession, and his newfound awareness that "mere presence in the area where drugs are found" was insufficient to find him guilty. The Petitioner claimed that the prosecutor did not "read the whole thing," which included the other elements necessary to establish constructive possession. According to the Petitioner, he should never "have been charged with constructive possession . . . at all."

---

represented the Petitioner at the November hearing because the conflict had arisen at the October hearing.

Regarding his Wisconsin conviction, the Petitioner was presented with the abstract of that conviction, which noted that the Petitioner was convicted of Class C felony with a sentence of three years, that incarceration was "imposed," and that the Petitioner stayed "[thirty] months." However, the Petitioner claimed that he was "only sentenced to thirty months" and did not receive a three-year sentence.

On redirect, the Petitioner reiterated that he told trial counsel he wanted to accept the nine-year deal in the weeks leading up to trial. According to the Petitioner, trial counsel said he would need to talk to the prosecutor and the judge first, and when trial counsel returned "[a]bout a week later," trial counsel told the Petitioner that the judge had taken "the deal off the table," despite being before the March 13, 2017 deadline. The Petitioner claimed that trial counsel said there was nothing more he could do about it and that was "the end of that[,] no more conversation." The Petitioner questioned the information trial counsel relayed because the judge had "g[iven] his word" in court that the Petitioner had until March 13 to accept the deal.

The Petitioner was again asked about the motion to suppress hearing and what more he was "wanting [his] lawyer" to argue. The Petitioner replied that he wanted trial counsel to exploit the "multiple conflicting statements" between the two agents' testimony, noting specifically Agent Ramirez's alleged testimony at the preliminary hearing[11] that he was the first to encounter the Petitioner inside the house and Agent Daugherty's testimony to the contrary at the suppression hearing.

The Petitioner asserted that he expressed his dissatisfaction to trial counsel with the plea "probably about ten minutes after" its entry. According to the Petitioner, they discussed the "advisability of filing anything further in [n]otice of [a]ppeal."

Finally, the Petitioner claimed that despite the possibility that he could "very well be a Range II offender," he still wanted to proceed to a jury trial. In addition, the Petitioner affirmed that if trial counsel had "s[a]t down" with him "and explained the elements of constructive possession and shown [him] cases where people had been convicted or found not guilty under similar facts," then he would not have pled guilty and would "have taken the case to trial."

The post-conviction court also asked the Petitioner several questions. When asked if the law was explained and he was provided examples of constructive possession at the guilty plea submission hearing, the Petitioner said,

> You said, possession may be actual or constructive. Possession is deemed
> to be constructive [sic] there must be proof that the accused has the power

---

[11] A transcript of the preliminary hearing is not a part of the record.

and intention at any given time to exercise domain and control over the drugs, either directly or through others. That's what you read. You didn't read no [sic] other part. I don't remember you reading me no [sic] other part.

The Petitioner could not specifically recall if he was provided examples. When asked if he remembered being advised that he was giving up his right to a jury trial and to appeal, the Petitioner said "probably." Further, the Petitioner did not recall being informed that "by taking a specific sentence . . . , that [he] no longer had a right to appeal."

The Petitioner also indicated that at one point during the guilty plea submission hearing, he tried to ask a question because he did not understand something. The Petitioner indicated that although he was provided with an explanation, he still did not understand and was told that his attorney would explain it to him. The Petitioner maintained, "I mean, a lot of stuff that was said[] that day is not in the transcript." The guilty plea submission hearing transcript was then entered into evidence.

Trial counsel testified that he was appointed to represent the Petitioner after a conflict had arisen between the Petitioner and the Public Defender's Office. Shortly after his appointment, trial counsel appeared with the Petitioner at a hearing to try to reinstate the Petitioner's bond. Although a new bond was set, the Petitioner was unable to meet the conditions for release. Trial counsel confirmed that he appeared again with the Petitioner in December 2016, as well as for the motion to suppress hearing in February 2017.

Regarding the motion to suppress, trial counsel testified that he attempted to argue that the search was conducted without a warrant and that no exception to the warrant requirement existed. Trial counsel confirmed that the State contended that the Petitioner did not have standing to challenge the search. Trial counsel explained that the Petitioner had told him that police found the cocaine when "they had reached down and—maybe the duffle bag, maybe underneath the table," but that it was not in plain view. Based upon the facts as provided to trial counsel by the Petitioner, trial counsel argued that anything found in the Petitioner's personal property or on his person should have been suppressed. However, during the suppression hearing, "it came out" that the agents went to pick up the scales on the table, believing the scales to be drug paraphernalia, and that the crack cocaine was found underneath the scales. Furthermore, according to trial counsel, one of the agents testified that nothing was found in the Petitioner's duffle bag and that "all the incriminating evidence was on the table."

Trial counsel was asked if he pointed out the discrepancies about how the drug task force approached the house where the Petitioner was eventually arrested, specifically about "one document" saying the agents approached the house to conduct a "knock and

talk" and "another saying" they had gone there to serve an arrest warrant on Paula Freeman. Trial counsel replied,

> I don't want to pat myself on . . . the back, but I tried to exploit every contradiction that I came across from the preliminary hearing, to the warrants, to the testimony that was presented that day. Every time there was an opportunity to exploit a contradiction, I was working it, exploiting that.

Trial counsel was also asked about the Petitioner's range of punishment, including the Petitioner's prior felony conviction from Wisconsin. According to trial counsel, he reviewed the Petitioner's felony convictions with him. Trial counsel was shown the abstract of the Petitioner's Wisconsin conviction that described the offense as "Burglary-Building or Dwelling, Felony C." A "charge modifier" was also notated thereon: "Party to a Crime." Trial counsel maintained, "Oh, . . . I know we argued about what that would be in terms of being here in Tennessee. And that there was no way I was going to allow you to introduce that document that you showed me in order to enhance it. I remember we had that discussion." Nonetheless, trial counsel acknowledged that any argument about the document was speculative and that the State was going to advocate that the Petitioner was a Range II offender if convicted.

Trial counsel affirmed that he had "a lot of conversations" with the Petitioner about the law of constructive possession. Trial counsel recalled discussing testimony from the preliminary hearing with the Petitioner and how, if the same was produced at trial, it was sufficient to convict the Petitioner of constructive possession. Trial counsel also remembered that they talked about how the Petitioner "didn't have anything on his person" but that he was "the only person that was in the room where the drugs were" discovered. Furthermore, while the Petitioner was found "standing in the middle of the room," it would be a jury question as to "whether [the Petitioner] could[,] or there was intent[,] to reduce the drugs to actual possession." Trial counsel felt as though the Petitioner understood his explanation of constructive possession.

Regarding the original nine-year offer from the State, trial counsel could not "recall how long it was out there," but trial counsel affirmed that he "had adequate time to discuss the offer [with the Petitioner] and either accept it or reject it." Trial counsel denied that the Petitioner expressed any desire to accept the deal early in the process, including at the time of the bond hearing or at the time of the suppression hearing. In addition, trial counsel recalled differently than the Petitioner, and according to trial counsel, the Petitioner indicated that he wanted to take the offer at some point before March 3, 2017, at least ten days prior to the beginning of trial. Trial counsel approached the State, who was willing to accept the deal, but the court was not. Trial counsel explained that the trial judge had a policy that once the case was set for trial, the parties lost "the ability to settle it." When asked whether he recalled the trial court's telling the

Petitioner that he had up until the day of trial to accept the nine-year plea offer, trial counsel replied, "No . . . . I don't recall that ever coming out of any judge's mouth ever, that I have ever appeared in front of in any court at all."

Ultimately, trial counsel was successful in negotiating a plea deal on behalf of the Petitioner for an eleven-year sentence as a Range I, standard offender. Trial counsel believed that this was "a good resolution" to the case because the eleven-year sentence was one year less than the minimum sentence the Petitioner would have received if sentenced as a Range II, multiple offender.

Trial counsel opined that the Petitioner knowingly entered his plea, including his understanding that "there was a possibility he could be Range II, but [a] possibility he could just be Range I." Trial counsel said that he did not know of "any issue" to appeal from a guilty plea with an agreed-upon sentence, and he denied that the Petitioner asked him to file an appeal in his case.

On cross-examination, trial counsel remarked that there was "no way that [the Petitioner] could have believed that [the nine-year] offer was still valid" when the Petitioner wrote the letter to the prosecutor. Trial counsel explained that he knew "without a doubt" by March 3 the trial court was not going to accept the nine-year deal based upon text messages he had exchanged with the prosecutor and the trial judge regarding the deal.

Regarding the motion to suppress, trial counsel confirmed that "on the warrant"[12] Agent Ramirez stated that they approached the house to conduct a "knock and talk" but at the hearing "he said several times he had a warrant." Trial counsel further confirmed that he had been provided a copy of Agent Ramirez's testimony at the preliminary hearing. Trial counsel also verified that the agents' testimony at the hearing conflicted about whether the Petitioner, when he was first encountered inside the home, was sitting in a chair or whether he was in the middle of the living room.

Trial counsel agreed that the suppression hearing testimony established there was "no dope" found on the Petitioner's person or in his duffle bag. Trial counsel thought these were "favorable facts in trying to argue against [the State's] constructive possession argument," and trial counsel stated that he discussed as much with the Petitioner.

Regarding the Petitioner's Wisconsin conviction, trial counsel confirmed that the Petitioner believed he had "pled guilty to an accessory" and that they had discussed this conviction. Trial counsel noted, however, that the Petitioner was incarcerated for thirty months for this conviction, which indicated a felony conviction, and that "the important

---

[12] This warrant is not a part of the appellate record.

thing" was not what the Petitioner believed, but what class the trial judge would have found the conviction equated to in Tennessee. According to trial counsel, the Petitioner's "biggest threat" of proceeding to trial was being sentenced as a Range II offender, and trial counsel opined that was "a big reason" why the Petitioner ultimately accepted the eleven-year plea deal.

Trial counsel testified that he had spoken with the Petitioner after the Petitioner had entered his plea. Trial counsel averred that he never advised the Petitioner that he could file a motion to set aside his guilty plea if he was dissatisfied. In addition, trial counsel stated that the Petitioner never asked him to request a copy of the transcript of his Wisconsin guilty plea.

On redirect examination, trial counsel confirmed that he received the discovery materials after he was appointed to the Petitioner's case. Within that file, there was a summary of the Petitioner's statement, wherein the Petitioner acknowledged "that he had a source and supply for crack cocaine" and that he was willing to attempt to make a controlled buy from his suppliers. However, the Petitioner later told trial counsel that he did not make this statement and explained that he was unable to provide the police with this information "because marijuana was his drug of choice." Trial counsel acknowledged that whether the Petitioner actually made the statement would have been an issue for the jury.

The post-conviction court then inquired about the Petitioner's prior felony conviction in Wisconsin. The post-conviction court asked trial counsel, "Did you believe this to be more like a person who would be criminally responsible versus someone that was an accessory after the event?" Trial counsel explained that "basically [the Petitioner] drove the person that committed the burglary to the place that it happened," which was a residence. In trial counsel's opinion, based upon the information provided to him by the Petitioner, the conviction was more akin to a conspiracy conviction in Tennessee, which would have made it a Class D felony.

The post-conviction court thereafter denied the Petitioner relief by written order filed on July 23, 2018, concluding therein that the Petitioner had failed to establish his claims of ineffective assistance of counsel. The post-conviction court addressed each of the Petitioner's specific claims individually, concluding that none of them entitled the Petitioner to relief. The post-conviction court then determined, in general, that the Petitioner's "credibility was dubious at best." The post-conviction court continued,

> [The Petitioner] is no stranger to the criminal justice system, was fully informed regarding his plea, had constitutionally adequate representation and specifically stated on the record he was taking his plea to avoid the

-14-

possibility of a greater sentence should he be convicted, i.e. taking a [R]ange [I] sentence though he is a [R]ange [II] offender.

This timely appeal followed.

## ANALYSIS

On appeal, the Petitioner addresses the same issues that were raised at the outset of the post-conviction hearing and submits that the post-conviction court erred when it denied him relief. The State responds that the post-conviction court correctly concluded that the Petitioner failed to carry his burden of proving that trial counsel was ineffective.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

In the context of a guilty plea, like the present case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have [pled] guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Walton v. State, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997). However, we note that a petitioner's "[s]olemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977).

> A petitioner's sworn responses to the litany of questions posed by the trial judge at the plea submission hearing represent more than lip service. Indeed, the petitioner's sworn statements and admission of guilt stand as a witness against the petitioner at the post-conviction hearing when the petitioner disavows those statements.

Alfonso C. Camacho v. State, No. M2008-00410-CCA-R3-PC, 2009 WL 2567715, at *7 (Tenn. Crim. App. Aug. 18, 2009).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

*A. Motion to Suppress*

The Petitioner first argues that trial counsel "failed to effectively argue the motion to suppress." According to the Petitioner, had trial counsel been better prepared at the suppression hearing, then trial counsel "could have explained the divergence" in the agents' testimony, specifically, about whether they came to execute an arrest warrant for Paula Freeman or were merely conducting a "knock and talk" and about the Petitioner's location in the living room at the time the agents entered. The Petitioner also notes that the agents never testified about where the cocaine was found, although it was inferred at the suppression hearing that "it was from under the scales which were on the table next" to the Petitioner. In addition, the Petitioner, citing to his own testimony at the post-conviction hearing, indicates that "there was no search warrant for Paula Freeman," and the Petitioner maintains that "[h]ad that been exploited, the agents would [n]ot have the right to be in the . . . house at all." Moreover, the Petitioner submits that had trial counsel "been better prepared to confront" the issue of standing, trial counsel could have called the Petitioner "to explain that he was an occupant of the house and/or that he did have a privacy interest in the home."

At the suppression hearing, the trial court asked a number of questions in an effort to understand the source of the Petitioner's complaints about the search, despite the State's assertion that the Petitioner lacked standing. Ultimately, the proof adduced at the suppression hearing established that the drugs were not found on the Petitioner's person or in his belongings. The trial court denied the motion, determining that the Petitioner was merely a casual guest in the home and thus had no privacy expectations in the residence.

The post-conviction court observed that "[t]he motion to suppress was vague and the court got the impression [the P]etitioner may not have told counsel the entire set of facts leading [trial] counsel to believe there was something in the overnight bag to suppress." We note that neither of the motions to suppress, the pro se motion or the one filed by trial counsel, were included in the record. In addition, at the post-conviction hearing, trial counsel testified that he attempted to argue that the search was conducted without a warrant and that no exception to the warrant requirement existed. Furthermore, trial counsel stated that based upon the facts as provided to him by the Petitioner, which included information that the cocaine was found "maybe" in the duffle bag or underneath the table, he contended that anything found in the Petitioner's personal property or on his person should have been suppressed. Trial counsel's testimony indicated that he was misinformed about the seizure of the cocaine based upon information provided to him by the Petitioner. The post-conviction court noted the trial court's ruling and surmised that trial counsel "can hardly be ineffective for presenting a motion and being unsuccessful."

At the post-conviction hearing, the Petitioner admitted his status as a guest in the home. For purposes of standing, the Petitioner, merely a casual guest, did not have a

-17-

reasonable expectation in the host's residence or apartment. See State v. Transou, 928 S.W.2d 949, 958 (Tenn. Crim. App. 1996); see also United States v. Dix, No. 94-4065, 1995 WL 351182, at *2 (6th Cir. June 9, 1995) (holding that as a casual, albeit frequent, visitor to his sister's apartment, who did not keep clothing there, who did not receive mail there, and who had no key, the defendant had no reasonable expectation of privacy in the premises). Without an expectation of privacy in the residence, the Petitioner merely had standing to challenge items found on his person or in his personal belongings, and the drugs were not found during either search.[13] Because the Petitioner did not have an expectation of privacy in the residence, he lacked the ability to challenge entry into the home and the subsequent search based upon whether there was a valid arrest warrant for Paula Freeman, whether the agents exceeded their authority of the "knock and talk," whether valid consent to search the residence was given, or whether the items were found in plain view. Despite the fact that the agents did not offer specific testimony at the suppression hearing about where the cocaine was found, it was inferred that it was found on the table once the agents examined the drug paraphernalia. The prosecutor also stated as much during his opening statement. There was no evidence presented at the post-conviction hearing that the agents would have testified differently at trial or that the cocaine was discovered in a different location. Furthermore, any divergence in the agents' testimony about the details leading up to the Petitioner's arrest would have gone to their credibility but would not have provided a basis to suppress the drugs.

The Petitioner has failed to establish that had trial counsel been better prepared at the suppression hearing, there was reasonable probability the motion would have been successful and the drugs would have been suppressed. See Samuel L. Giddens v. State, No M2006-01938-CCA-R3-PC, 2008 WL 271967, at *6 (Tenn. Crim. App. Jan. 29, 2008) (citing Strickland, 466 U.S. at 694). As such, he has failed to show ineffective assistance in this regard.

## B. *Range Classification*

Next, the Petitioner contends that trial counsel "failed to investigate whether [the Petitioner] was a Range I or Range II offender and the same affected [the Petitioner's] decision to go to trial." The Petitioner asserts that trial counsel "was deficient in not investigating the Wisconsin conviction to determine whether or not it was a qualifying conviction" for range classification purposes. The Petitioner notes that the Wisconsin

---

[13] We feel constrained to observe that $136 was found on the Petitioner's person, which cash was referenced by the prosecutor during his opening statement as supplying incriminating evidence that the drugs were for resale. Nonetheless, the Petitioner never specifically referenced suppression of the cash found on his person during the pendency of these proceedings. Moreover, we note that addressing the constitutionality of the search is unnecessary because there was evidence, in addition to the cash, that the cocaine was for resale given the way it was packaged in small bags and the Petitioner's statements that he had suppliers for cocaine and would help in apprehending those suppliers.

conviction "was presented as an abstract of conviction" and that although the "conviction purports to be accessory to burglary," no copy of the actual conviction is in the record. According to the Petitioner, because "the convictions were not thoroughly evaluated," and because his range classification was the "biggest threat to [him] had he gone to trial," "he was not provided sufficient information to make an intelligent, advised choice to plead guilty."

The post-conviction court found this allegation to be without merit, first noting that the State gave notice of enhancement on February 27, 2017, indicating the Petitioner was a Range II, multiple offender, and that the notice included the Wisconsin conviction. The post-conviction court then determined that the Petitioner had failed to prove his factual allegations in this regard by clear and convincing evidence, reasoning as follows:

> [The] Petitioner was on notice of the convictions serving as the basis for enhancement. He did not at anytime during the pendency of the charges or during the post-conviction hearing ever deny these convictions were not properly his. The most logical explanation for [the P]etitioner's plea was to accept punishment in [R]ange [I] instead of risking a conviction and being sentenced in [R]ange [II]. This is supported by explanation of trial counsel at the hearing as well as the plea transcript wherein [P]etitioner was asked by the court if he were taking this plea to avoid possible greater punishment if convicted. The [P]etitioner replied "yes."
>
> While the [S]tate is required to provide notice of the convictions it relies upon for enhancement, the [P]etitioner is charged with some responsibility for knowing his prior criminal history.

At the post-conviction hearing, trial counsel testified that he intended to object to entry of the abstract of conviction if the matter went to the sentencing phase. However, trial counsel acknowledged that any argument about the document was speculative and that the State was going to advocate that the Petitioner was a Range II, multiple offender if he was convicted by a jury.

In addition, trial counsel stated that he had discussed the Wisconsin conviction with the Petitioner. Trial counsel explained that "basically [the Petitioner] drove the person that committed the burglary to the place that it happened," which was a residence. In trial counsel's opinion, the conviction was more akin to a conspiracy conviction in Tennessee, which would have made it a Class D felony and sufficient to establish the Petitioner's Range II status. Trial counsel believed that the Petitioner knowingly entered his plea with an awareness that "there was a possibility he could be Range II, but [a] possibility he could just be Range I."

-19-

The Petitioner did not present a certified copy of the Wisconsin conviction at the post-conviction hearing or offer any additional evidence that the Wisconsin conviction equated to lower than a Class D felony in Tennessee. While the Petitioner claimed that he had asked trial counsel to obtain the transcript of the Wisconsin guilty plea, trial counsel testified to the contrary, and the Petitioner did not include that transcript in the record. Moreover, the post-conviction court noted that the Petitioner's "credibility was dubious at best" and that the Petitioner "specifically stated on the record he was taking his plea to avoid the possibility of a greater sentence should he be convicted, i.e. taking a [R]ange [I] sentence though he [was] a [R]ange [II] offender."

The Petitioner has failed to establish what further investigation by trial counsel into the Wisconsin conviction would have revealed and, thus, has not satisfied his burden of proving his factual allegations by clear and convincing evidence. Moreover, the guilty plea submission hearing transcript provides ample evidence that the Petitioner was adequately advised of the possible ranges of punishment for his crimes, including discussion about his prior qualifying felonies for range classification purposes and his criminal record, and that he was pleading guilty in order to avoid the possibility of greater sentencing exposure if convicted at trial. The Petitioner has not proven either deficient performance or prejudice in this regard.

C. *Constructive Possession*

The Petitioner contends that trial counsel failed to adequately advise him on the concept of actual versus constructive possession and that, therefore, he did not knowingly waive "the defense of non-possession" when he entered his plea. The Petitioner, citing to his own testimony, alleges that trial counsel advised him that "if the drugs were found in the same room with him[,] then he would be found in actual possession of the drugs." According to the Petitioner, "had the concept of constructive possession been properly explained to him, that is, that the several factors such as access and control of the drugs were properly explained to him, he would have proceeded to trial."

The post-conviction court concluded that the Petitioner had failed to establish his factual allegations by clear and convincing evidence. In reaching this conclusion, the post-conviction court noted trial counsel's testimony that he "explained actual and constructive possession to the [P]etitioner" and the Petitioner's acknowledgment at the guilty plea submission hearing that he affirmatively understood the concept of actual versus constructive possession after the trial court provided the Petitioner with an explanation and examples.

Trial counsel testified at the post-conviction hearing that he had "a lot of conversations" with the Petitioner about the law of constructive possession, including talking about testimony from the preliminary hearing with the Petitioner and about how

the Petitioner "didn't have anything on his person" but that he was "the only person that was in the room where the drugs were" discovered. Furthermore, trial counsel felt as though the Petitioner understood his explanation of constructive possession. The post-conviction court accredited trial counsel's testimony over the Petitioner's.

Moreover, the trial court thoroughly explained the concept to the Petitioner at the guilty plea submission, even providing examples. We also note that following discovery of the crack cocaine, the Petitioner admitted to the agents that "he had sources of supply for crack cocaine" in both Murfreesboro and Nashville and that "he would be willing to work with the drug task force in catching these individuals." This specific allegation of ineffective assistance does not entitle the Petitioner to relief.

### D. *Original Nine-Year Offer*

As his next allegation, the Petitioner submits that trial counsel "failed to argue for the enforcement of the original plea offer" of nine years as a Range I, standard offender. According to the Petitioner, he was immediately incarcerated for contempt of court when the original offer was extended to him on October 17, 2016. The Petitioner maintains that when trial counsel was subsequently appointed to his case, the Petitioner "had the offer in hand," and the Petitioner "thought[,] albeit mistakenly, that he had until March 13, 2017[,] to accept the plea offer." The Petitioner surmises that trial counsel's failure to "more aggressively pursue[] enforcement" of the original nine-year plea offer, which the State was still willing to accept, forced him to accept a harsher sentence of eleven years rather than risk the potential of a Range II sentence if convicted at trial.

The post-conviction court determined that the Petitioner's claim in this regard had no merit. The post-conviction court stated that the Petitioner was "assail[ing] counsel for apparently not forcing the trial court to take the plea" of nine years. Initially, the post-conviction court referenced trial counsel's testimony that "he had adequate time to discuss the plea with [P]etitioner[,] who initially never accepted the offer," and then found that "[d]espite [the P]etitioner's assertion to the contrary, trial counsel never advised the [P]etitioner he had until the trial date to make up his mind." Additionally, the post-conviction court cited State v Williams, 851 S.W. 2d. 828, (Tenn. Crim. App. 1992), for the legal tenet that "[a] trial judge is not bound by a plea agreement and has the discretion to reject or accept it" and concluded that the trial court was exercising its prerogative to reject the nine-year plea offer because the Petitioner "waited until the day of trial to accept an offer he could have accepted long ago."

The post-conviction court's logic is sound. The Petitioner conceded that he never expressed his intention in court to accept the nine-year plea at any of the hearings that took place on October 17, 2016, November 23, 2016, December 19, 2016, or February 23, 2017. Trial counsel testified that he "had adequate time to discuss the offer [with the

Petitioner] and either accept it or reject it." The post-conviction court accredited trial counsel's testimony that the Petitioner was never informed that he had until the day of trial to decide. When the Petitioner finally decided to accept the offer, the trial court would not accept it, as was its prerogative. Thereafter, trial counsel was successful in negotiating an eleven-year offer after opening statements had commenced. We agree with the post-conviction court that this ineffective claim does not entitle the Petitioner to relief.

### E. *File an Appeal*

Finally, the Petitioner argues that trial counsel "failed to perfect an appeal" after the Petitioner entered his guilty plea. The Petitioner cites to his own testimony "that he expressed his dissatisfaction with the plea 'within [ten] minutes after'" entry, and then the Petitioner extrapolates that trial counsel "could have filed a motion to set [aside] the plea or perhaps a motion to amend or correct the sentence pursuant to Rules 35, 36 [of the] Tennessee Rules of Criminal Procedure." (Underline removed). Instead, the Petitioner "was left with a final conviction" and incarcerated.

The post-conviction court determined that "[t]his issue ha[d] not been proven and ha[d] no merit." In so ruling, the post-conviction court cited trial counsel's testimony at the post-conviction hearing that the Petitioner "never asked him to appeal anything." The post-conviction court also observed that the "Petitioner took a plea with an agreed-upon sentence," and that at the guilty plea submission hearing, the Petitioner was advised, and he acknowledged, he was waiving his right to appeal his agreed-upon sentence and "this was the end of his case."

Trial counsel testified that he never advised the Petitioner he could file a motion to set aside his guilty plea if he was dissatisfied and that the Petitioner never requested him to appeal anything. This was an agreed-upon sentence, and we reiterate that the post-conviction court found the Petitioner's "credibility dubious at best." In addition, the Petitioner offered no evidence at the post-conviction hearing that a motion to set aside the plea or for a reduction in sentence had any reasonable probability of success. Also, the trial court thoroughly advised the Petitioner at the guilty plea submission hearing about the loss of the Petitioner's right to appeal an agreed-upon sentence from a guilty plea. The Petitioner failed to establish the facts supporting his claim or that he was prejudiced by any alleged deficiency.

### CONCLUSION

Upon consideration of the foregoing and the record as a whole, we agree that the Petitioner has failed to show that trial counsel was ineffective. The judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE